308 Ga. 563
FINAL COPY

S20A0380. VALRIE v. THE STATE.

BLACKWELL, Justice.

Reuben Arthur Valrie was tried by a Gwinnett County jury and convicted of murder and other crimes in connection with the death of his infant daughter Aliyana. Valrie appeals, claiming that he was denied the effective assistance of counsel. We disagree and affirm.[1]

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows that Valrie and his girlfriend,

---

[1] Aliyana was killed in January 2014. A Gwinnett County grand jury indicted Valrie in August 2017, charging him with two counts of murder in the commission of a felony (predicated on cruelty to children and aggravated battery), cruelty to children, and aggravated battery. Valrie was tried in October 2017, and the jury found him guilty on all counts. The trial court sentenced Valrie to imprisonment for life for felony murder predicated on aggravated battery and a concurrent term of imprisonment for 20 years for cruelty to children. The other felony murder was vacated by operation of law, and the aggravated battery merged. Valrie timely filed a motion for new trial in November 2017, which he amended in December 2018. The trial court denied that motion in April 2019, and Valrie then timely filed a notice of appeal. Upon receipt of the record in September 2019, the case was docketed in this Court to the term beginning in December 2019 and submitted for decision on the briefs.

Kendre Nix, lived in a Gwinnett County apartment with Aliyana and Nix's three other children.[2] Aliyana had been born prematurely in October 2013, was kept in the neonatal intensive care unit for around eight weeks, and weighed approximately five pounds when she was discharged to Valrie and Nix on December 11. On December 22, Nix brought Aliyana to the hospital because she had been "crying uncontrollably." Aliyana weighed just over six pounds, and x-rays of her chest and abdomen showed no abnormalities. The doctor concluded that Aliyana suffered from colic and constipation, prescribed medications for the constipation, and discharged her that afternoon.

On January 15, 2014, Nix's three older children went to school, and Nix left for work around 8:30 in the morning. Aliyana had some nasal congestion, and she had cried throughout the night, but she otherwise appeared to be healthy, and Nix thought Aliyana sounded fine when she called to check on her around 10:30 that morning.

---

[2] The children were ages 9 and 7 (the younger being twins).

There was conflicting evidence about how Valrie and Aliyana spent the next few hours. Valrie was supposed to pick up the older children from the bus stop around 3:15 that afternoon, but Nix received a call from a neighbor who told her that Valrie had not shown up. (The neighbor agreed to keep the children until Valrie arrived.) Valrie told Nix that he had been at the bank all morning and then was delayed by a "stalled car" or "accident"[3] on Club Drive, but he later admitted that he lied about being at the bank all morning, and police investigators were not able to corroborate his claim that there had been a stalled car or accident on or around Club Drive that day. Valrie finally showed up with Aliyana to retrieve the older children around 3:45 p.m.

According to Valrie, he and all the children arrived home around 4:00 p.m., and he then took Aliyana from the car to her bedroom in her car seat, removed her from her car seat, swaddled her, and placed her in a rocker in the living room with a blanket over

---

[3] Valrie initially described the incident as an "accident," but he later began describing it as a "stalled car."

her while he worked on the laundry. When Nix arrived home around 5:30 p.m., she spoke with Valrie, who was in the parking lot to take out the trash, and then went inside the apartment to check on the children. She discovered that Aliyana was "unresponsive" and that her body was "stiff" and "cold to the touch." Nix called 911 at 5:58 p.m. and repeatedly screamed that her baby was dead.

First responders arrived shortly thereafter, grabbed Aliyana's body, and took her in the ambulance to the hospital. One of the paramedics performed chest compressions with his thumbs, but he was unable to perform rescue breathing because Aliyana's jaw would not open. Aliyana's body arrived at the hospital at 6:17 p.m. She had no pulse, was "stiff" and "blue," and her rectal temperature was 84 degrees. Doctors placed Aliyana's body on a board and performed two-finger chest compressions, but they were unable to revive her, and she was pronounced dead at 6:29 p.m.

Almost immediately, Nix's family members suspected that Valrie was responsible for Aliyana's death. The autopsy was completed on January 16 and showed that Aliyana died as a result

of closed head trauma, with a blunt-force abdominal injury as a secondary cause of death. The medical examiner found approximately 100 milliliters of blood around Aliyana's brain (primarily resulting from subdural and subarachnoid hemorrhages) and about 60 milliliters of blood in her abdomen (likely as a result of a large laceration to her liver). She had multiple rib fractures with bleeding around them (that were not the result of having received CPR) and an adrenal injury. Given that about half of Aliyana's blood was hemorrhaged around her brain and in her abdomen, the medical examiner estimated that Aliyana would have become unresponsive and survived for less than 30 minutes after sustaining her injuries.

Valrie provided several different stories to police investigators. During interviews conducted on January 16, he first maintained that he had no idea how Aliyana was injured and that he did not know anything was wrong with her until Nix discovered that she was dead. Eventually, Valrie said that Aliyana may have been hurt when her car seat tilted over partially while he was running errands. In addition to the story about going to the bank and being delayed

by a stalled car or accident, Valrie also said that he had visited the house of a man named "Mike" whom he had known for three years, but he was unable to provide Mike's last name or any information that would allow police investigators to contact him. When the investigators told Valrie that Aliyana's injuries were not consistent with her car seat tilting, but were more likely caused by being shaken or dropped, Valrie said that Aliyana had rolled off the bed and fallen "head-first" onto the carpeted floor. (But in a jailhouse phone call, Valrie later admitted that he made up the story about Aliyana rolling off the bed.) Finally, Valrie acknowledged that he briefly shook Aliyana while he was trying to pick her up after they returned to the apartment around 4:00 p.m. He noticed that Aliyana's head went back like "whiplash," and that something about her "changed" as a result.[4] But instead of seeking help for Aliyana,

---

[4] According to Valrie, Aliyana "squirmed" as he was picking her up from her car seat, he lost his grip on her, and he had to grab her "kind of hard" so that she would not fall. As he grabbed Aliyana, there was a "jerk" that was serious enough for Valrie to believe something had happened to her. But this story about accidental shaking was inconsistent with Valrie's earlier claim that he noticed that Aliyana did *not* squirm and was unusually still (but alive) as he removed her from her car seat and swaddled her.

Valrie swaddled her, put her in the living room rocker, and worked on the laundry.

At trial, Valrie presented the testimony of four expert witnesses who testified that Aliyana died of natural causes and that the injuries to her brain and abdomen were caused by events such as post-mortem CPR[5] and the "rough" handling of her body by the first responders. The jury rejected this defense and found Valrie guilty of murder and the other charges. Valrie does not dispute that the evidence is sufficient to sustain his convictions. But consistent with our usual practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence. We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Valrie

---

[5] There was conflicting evidence about whether (and how) Valrie performed chest compressions on Aliyana's body before the paramedics arrived. Valrie told police investigators that he did chest compressions with three fingers as the 911 dispatcher instructed him, but that he did so only "one time." Nix testified that she did not see Valrie perform chest compressions but that one of her daughters later told her that she had seen him perform CPR "with both hands."

was guilty of the crimes of which he was convicted. See <u>Jackson v. Virginia</u>, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Valrie claims that he was denied the effective assistance of counsel during his trial. To prevail on a claim of ineffective assistance, Valrie must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. See <u>Strickland v. Washington</u>, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyer was deficient, Valrie must show that his lawyer performed her duties at trial in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-688 (III) (A). See also <u>Kimmelman v. Morrison</u>, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that he was prejudiced by the performance of his lawyer, Valrie must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466

U. S. at 694 (III) (B). This burden is a heavy one, see <u>Kimmelman</u>,

477 U. S. at 382 (II) (C), and Valrie has failed to carry it.

(a) First, Valrie contends that his trial lawyer should have

raised a hearsay objection to the admission of recorded statements

that Nix made to police investigators (as well as the testimony of one

of those investigators about some of those statements).

Alternatively, Valrie argues that his lawyer should have sought the

redaction of certain portions of the recorded statements that

impugned his character.[6]

The statements at issue were made by Nix in a police

interrogation room on the day after Aliyana died. The vast majority

of the statements were to the police investigators, but Nix also was

recorded briefly talking on her cell phone to a friend while the

---

[6] Contrary to Valrie's claim that his lawyer "agree[d] to allow all recorded statements" to be admitted, the recordings *were* redacted to remove statements that Nix made about Valrie's violent behavior toward her (including choking and head-butting her in the weeks before Aliyana's death), his prior criminal record, and his methamphetamine use (which Nix said had resumed shortly before Aliyana's death and had led to discord in their relationship).

investigators were absent from the room. Nix told the investigators that she suspected Valrie was responsible for Aliyana's death, and she made numerous comments to the investigators and her friend about his untruthfulness. She said that he had been dishonest with her throughout their relationship, that he was also dishonest with his mother, that "[a]nything I have found out about him, it's because I've been an investigator myself . . . and found it out," that "if he did do anything to [Aliyana], I honestly don't think he would tell me," and that "if something did happen to [Aliyana] while in his care, he wouldn't tell me." In addition, Nix told the investigators that Valrie "hangs out with not so good people" and "people he is not supposed to be with" (including "Mike") and that he once took $4 from her wallet that she needed for gas (although he later paid her back $30).

Pretermitting whether the failure of Valrie's trial lawyer to object to the admission of the recorded statements amounts to constitutionally deficient performance, Valrie's claim of ineffective assistance fails because he has not established prejudice. First, the recorded statements made by Nix were, in many ways, favorable to

Valrie. Nix said that Valrie was never violent with the children. She countered the State's theory that Valrie killed Aliyana because he was frustrated with her crying by saying that she had never seen him get frustrated or angry with the children, specifically including when Aliyana would cry. She said that Valrie was helpful with the children, that he did not say anything "weird" on the day that Aliyana died, and that he did not act unusually after her death. And even when Nix suggested that Valrie might be responsible for Aliyana's death, she did so in ways that were favorable to him: suggesting that he may have inadvertently strapped her into the car seat too tightly or accidentally dropped her.

Moreover, the statements in the recordings about Valrie's untruthfulness (which are the statements that Valrie alleges were most prejudicial)[7] were cumulative of other evidence. In particular,

---

[7] We need not discuss all of the other statements made by Nix, but we do note that, as to Nix's statement that Valrie hangs out "with people he is not supposed to be with," including "Mike," Valrie appeared to acknowledge in one of his interviews with police investigators that "Mike" was a marijuana dealer. And it is hard to imagine that Nix's statement that Valrie took $4 from Nix's wallet played any role in the jury's verdict (especially given her acknowledgment that he paid her back $30).

Valrie made a jailhouse phone call in which he acknowledged to Nix that he had "been a compulsive liar throughout [their] relationship." And Valrie's own admission to having been a "compulsive liar" would have been more persuasive evidence of his untruthfulness than statements made by Nix about him on the day after she came home from work and discovered that her daughter was dead. In addition, other testimony showed that Valrie had been dishonest with members of his own family, and it was clear (often through admissions made by Valrie) that he repeatedly had been untruthful in the stories he provided about his actions just before Aliyana's death. As a result of the plethora of other evidence about Valrie's dishonesty, Valrie has not established that there is a reasonable probability the result of his trial would have been different if his lawyer had objected to the admission of Nix's statements or sought further redactions to the statements. See Virger v. State, 305 Ga. 281, 296 (8) (b) (824 SE2d 346) (2019) (any error in the admission of character evidence was harmless because it was "largely cumulative" of other evidence); Hurt v. State, 298 Ga. 51, 58 (3) (b)

(779 SE2d 313) (2015) (even if certain recordings were improperly admitted, they were cumulative of other evidence, and so the defendant failed to show prejudice).[8]

(b) In addition, Valrie alleges that his trial lawyer should have objected to a question that the prosecuting attorney asked one of Valrie's expert witnesses. During voir dire of Dr. Zhongxue Hua, whom Valrie called to testify as an expert in forensic pathology and neuropathology, Hua claimed that he had testified at least 250 times. The prosecuting attorney said that he had searched a "database" for the name "Zhongxue Hua," and he asked Hua if he could "explain the discrepancy between the amount of times you've testified and the amount of times that it's been reported that you've

---

[8] We also note that, while Valrie correctly states in his brief that the prosecuting attorney made numerous references to Valrie's alleged dishonesty during closing argument, only one of those references related to the statements made by Nix that are at issue here. And the prosecuting attorney concluded that reference by minimizing the need to rely on Nix's statements, telling the jury that "[y]ou don't even have to take [Nix's] word for it, you can believe [Valrie] . . . when he says [']I know I've been a compulsive liar the whole relationship.[']" The other references to Valrie's dishonesty in the closing argument related to evidence that Valrie's sister and other family members did not think Valrie was always truthful and (again) to Valrie's admission to being "a compulsive liar."

testified." Valrie now contends that his lawyer should have objected to the reference to the database as irrelevant and requested a curative instruction.

At the hearing on Valrie's motion for new trial, his trial lawyer testified that she did not object to the question because (among other reasons) she did not "like to draw attention to . . . unnecessary things by objecting to them." Indeed, there may not have been much to gain from an objection, because Hua responded to the question by challenging the database mentioned by the prosecuting attorney and whether it was "good enough, accurate enough, [and] sufficient enough."[9] Moreover, given that no evidence was ever provided — either at trial or at the hearing on Valrie's motion for new trial — about the database that the prosecuting attorney referenced, we can only speculate about what would have happened if Valrie's trial lawyer had chosen to make an issue of the alleged "discrepancy." While it may be that the database was faulty, as suggested by Hua,

---

[9] After voir dire was completed, the prosecuting attorney did not raise any objections to Hua's status as an expert and stipulated to his being "tendered as a defense expert in forensic pathology and neuropathology."

there is nothing in the record to establish that. So we cannot say that it would have been helpful to Valrie's defense if his lawyer had raised concerns about this topic.

The prosecuting attorney's question about the database — and Hua's response — did little, if anything, to implicate Hua's credibility, especially given that the prosecutor did not object to Hua's being qualified as an expert. And any negligible benefit in raising an objection was counterbalanced by an unknown risk to Hua's credibility if the prosecuting attorney further described the database to prove its relevance. As a result, the tactical decision made by Valrie's lawyer not to bring further attention to the database was not objectively unreasonable; and for the same reasons, Valrie has not shown any probability that the outcome of his trial would have been different if his lawyer had raised an objection to the question about the database. See Foreman v. State, 306 Ga. 567, 570-571 (3) (832 SE2d 369) (2019) (because defendant failed to present certain evidence at hearing on motion for new trial, "we cannot say that trial counsel was deficient when he failed to

develop and present this evidence to the jury, nor can we say that [the defendant] was prejudiced by that failure").

Judgment affirmed. All the Justices concur.

DECIDED APRIL 20, 2020.
Murder. Gwinnett Superior Court. Before Judge W. Davis.
*Lynn M. Kleinrock*, for appellant.
*Daniel J. Porter, District Attorney, Samuel R. d'Entremont, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.