314 Ga. 400
FINAL COPY

S22A0815.  JONES v. THE STATE.

COLVIN, Justice.

Reginald Jones appeals his convictions for malice murder and other related offenses in connection with the death of his pregnant girlfriend, Faith Bittinger.[1]  Jones raises two enumerations of error.

---

[1] Bittinger and her unborn child died on July 8, 2017.  On January 12, 2018, a Fulton County grand jury indicted Jones for malice murder (Count 1), felony murder predicated on aggravated assault with a deadly weapon (Count 2), felony murder predicated on possession of a firearm by a first offender probationer (Count 3), feticide (Count 4), aggravated assault with a deadly weapon (Count 5), possession of a firearm during the commission of a felony (Count 6), and possession of a firearm by a first offender probationer (Count 7).  A jury trial was held from February 6 to 12, 2019.  The jury found Jones guilty of Counts 1-3 and 5-7.  The jury also found Jones guilty of involuntary manslaughter, a lesser-included offense of Count 4.  The felony murder counts were vacated by operation of law, and the count of aggravated assault merged with the malice murder conviction for sentencing purposes.  The court sentenced Jones to life in prison for murder followed by two consecutive five-year terms in prison for possession of a firearm during the commission of a felony and possession of a firearm by a first-offender probationer.  The court also imposed a sentence of ten years in prison for involuntary manslaughter, to be served concurrently with the sentence for murder.

Jones timely filed a motion for new trial on February 13, 2019, and amended the motion through new counsel on July 9, 2021.  On November 12, 2021, the court held a hearing on the motion.  The court denied the motion for new trial on November 19, 2021, and Jones appealed.  The case was docketed

First, he argues that the trial evidence was insufficient to establish that he killed Bittinger with malice aforethought.  Second, he argues that trial counsel was ineffective for calling as a character witness Jones's neighbor, Wilton Ray Blount, Sr., because doing so permitted the State to introduce prejudicial character evidence.  We affirm.

1.    The evidence presented at trial showed the following.[2] Around 10:30 p.m. on July 8, 2017, Jones called 911 to report that his 23-year-old girlfriend, Bittinger, had shot herself in the chest with a Hi-Point .45-caliber pistol and was no longer breathing. Describing the events leading up to Bittinger's death to dispatch, Jones said, "I was here with her.  We had some drinks, and she was playing with the gun, and she shot herself."

A few minutes later, Officer Joseph Franczek responded to the apartment shared by Jones and Bittinger.   Jones led Officer

_____

to our April 2022 term and submitted for a decision on the briefs.
    [2] Because Jones claims not only that the trial evidence was insufficient to support his convictions but also that trial counsel was ineffective, we set out the evidence in some detail and not only in the light most favorable to the jury's verdicts.  See *Debelbot v. State*, 308 Ga. 165, 168 n.6 (839 SE2d 513) (2020).

2

Franczek upstairs, across a landing, and into a bedroom, where Bittinger was lying dead on her back. The Hi-Point pistol was next to her right hand; the gun's magazine was next to, and resting partially on top of, her right elbow; and an empty shell casing was on the floor near her left knee. When asked when this had happened, Jones responded, "Just a second ago. We were drinking. She was playing with the gun. And she cocked it. I said, 'baby.' And she shot herself." Jones told the officer that "it was an accident." Similarly, Jones told Sergeant Charles Landrum, who arrived at the scene shortly after Officer Franczek, that Bittinger had pulled the magazine out of the gun and accidentally shot herself, after which he pulled her down from the bed to the floor so he could offer aid.

Sergeant Landrum testified that he discovered an unused bullet lying on the landing outside the bedroom. A crime scene technician later determined that the bullet collected from the landing was .45 caliber, that the shell casing next to Bittinger's body was from a .45-caliber bullet, and that the eight-round magazine resting on Bittinger's arm contained only six bullets.

3

The medical examiner who performed the autopsy testified that Bittinger had been shot in the chest below her collarbone, that the bullet had traveled "strongly downward" from the entrance wound, and that the gunshot wound had killed both Bittinger and her two- or three-week-old fetus. According to the medical examiner, the lack of soot or stippling on Bittinger indicated that the gun had been fired from more than three feet away, meaning that Bittinger could not have shot herself. The medical examiner also identified numerous bruises on Bittinger's body.[3]

The State's firearms expert, Emily Bagwell, testified that the Hi-Point pistol had a six-and-a-quarter pound trigger pull, a manual safety, and a magazine safety, which prevented the gun from firing

---

[3] The medical examiner testified that Bittinger had so many bruises that, although he "tried to [individually] list as many of them as [he] could" in his autopsy report, he had to "group[ ] some of them together," and there were "enough of them that the [autopsy] pictures and the report may not be perfectly matched up." Although the medical examiner testified that the bruises did not contribute to Bittinger's death, the prosecution relied on the medical examiner's testimony, together with other evidence of domestic abuse described below, to argue in closing arguments that "the bruises that [Jones] inflicted on [Bittinger]" and that her family members had described for the jury were "still on her body" when she died.

unless a magazine was inserted. She further testified that the Hi-Point pistol's manual safety doubled as a slide lock mechanism and that she had determined from testing that the magazine safety was properly functioning.[4]

The State called several witnesses to testify about events leading up to Bittinger's death. The evidence showed that Bittinger was living in Florida with family members in 2015. In 2016, Bittinger, who had a son from a prior relationship, moved back to Georgia and started dating Jones. Bittinger and Jones eventually moved in with Bittinger's stepfather, Dennis Martin. Dennis testified that, while the couple lived with him, he "thought things were good" in their relationship, and he saw "[n]o physical violence" or threats.

In August 2016, Bittinger, Bittinger's son, and Jones moved

---

[4] Bagwell initially testified on cross-examination that the pistol's slide did not lock back. After testifying, however, she contacted the prosecutor to express that, upon further reflection, her testimony on that point had been incorrect. Accordingly, the parties agreed to allow the court to read to the jury a stipulation as to what her testimony should have been regarding the slide lock.

5

into the basement of a house owned by Kristin Minnis, one of Bittinger's relatives. Shortly thereafter, Bittinger, who was pregnant with Jones's child, gave birth to a daughter. Kristin testified that she did not notice any relationship problems between Bittinger and Jones until January 2017, when she heard Bittinger screaming and a loud banging noise in the basement. Kristin went to the basement door, where she heard Bittinger yelling, "Stop, stop." When Kristin opened the door, Bittinger ran to the doorway with Jones following behind her. Bittinger's lip and eye were bloody. When Kristin told them that she would not tolerate such behavior in her house and they had to move out, Jones responded, "Oh, it was me. I get the blame for everything."

Although the couple temporarily left the house, they did not immediately move out. Soon after the incident, Jones approached Kristin, saying, "I owe you an apology. What I did was wrong and I should not have done it." Kristin responded "You're right. You should not have put your hands on her. You are not supposed to do that as a man." In response, Jones said, "She just pushes my buttons

6

and she knows what to do."

Later that month, Bittinger's sister-in-law, Kayla Minnis, who also lived in Kristin's house, heard Jones and Bittinger arguing in the basement. Kayla heard Bittinger trying to come up the stairs while saying, "Let me go. Let me go." Shortly thereafter, Bittinger came upstairs, and Kayla observed that Bittinger had distinct finger marks around her neck, a scuff on her chin, and bruising around her eye. Jones followed Bittinger upstairs and appeared to be "[v]ery angry and full of rage." When Kristin confronted Bittinger about the incident, Bittinger admitted that she and Jones had another fight and that Jones had left marks on her again. Kristin told Bittinger she had to move out by that weekend, and Bittinger did so.

Bittinger's stepsister, Olivia Martin, also started observing bruising on Bittinger's face and neck starting in late 2016 or early 2017. Initially, Bittinger avoided giving Olivia "a straight answer" about how she got the bruises. But eventually Bittinger admitted that "she had been punched in the face repeatedly" by Jones. Sometime in early 2017, Bittinger called Olivia to say she was afraid

7

she was going to die because Jones had "attacked her while she was holding her child and punched her in the face and thrown her into a dresser and then thrown her to the ground and got on top of her and was choking her." Although Olivia encouraged Bittinger to go to the police and leave Jones, Bittinger said that Jones had threatened to kill her and her family members if she tried to leave. In February 2017, Olivia took photos of Bittinger's bruises to document the injuries in case Bittinger went to the police.

Olivia and Bittinger's sister, Mary Amber Eaton, both testified that Bittinger had worn sunglasses even when it was dark outside to cover her bruises. Dennis also observed that Bittinger had bruises on at least two occasions after Jones and Bittinger moved out of his house. In one case, he said, the bruises were shaped like fingers around Bittinger's arm. Olivia testified that the abuse seemed to increase as it got closer to the date of Bittinger's death, that Bittinger went through 15 phones during the course of the relationship because Jones frequently threw her phones against the wall, and that Bittinger told Olivia she was planning to buy a

8

firearm because she was afraid of Jones.

According to Tiffaney Mullinix, who worked at a restaurant with Dennis's girlfriend, Bittinger often came into the restaurant with visible bruises. In June 2017, Bittinger told Mullinix that she knew she needed to leave Jones but that he had told her that he would kill her if she did. On June 19, 2017, Bittinger sent a text message to a person identified in Bittinger's phone as "My Lifeline." Invoking Jones's nickname, "Pancho," the text message said in relevant part, "I'm stuck with the accusing angry hitting cursing p[a]ncho."

According to Dennis, about a month before she died, Bittinger learned that she would inherit a sum of money, due to her grandfather's death. Dennis testified that Bittinger's plan was to use the money to relocate back to Florida. When asked on cross-examination, however, Sergeant Landrum testified that he did not observe suitcases or moving boxes in Bittinger's bedroom.

Jones took the stand in his own defense. According to Jones, in January 2017, he and Bittinger got into an altercation in Kristin's

9

basement, which was prompted by the discovery that they had each been texting members of the opposite sex. Jones said that, after throwing each other's phones, Bittinger slapped him, and he "slapped her back," and they "started to physically fight." Jones said that, as a result of the fight, Bittinger "had a little bruising and [he] had bruising[,] but [he] was able to cover it up where [Kristin] was not able to see it." According to Jones, after the fight, Bittinger's family no longer liked him, and he and Bittinger split up.

Jones testified that, in March 2017, he and Bittinger got back together. After saving some money, they moved into the apartment where Bittinger later died. Jones said their relationship was fine at that point and that, although they had disagreements, "it was nothing physical."

Soon after moving into the new apartment, Jones and Bittinger discovered that they were living in a high-crime area. Jones acknowledged that he knew he was not supposed to have a gun because he had been on probation for burglary since 2014. But Jones knew someone from whom they could buy a gun, and, according to

10

Jones, Bittinger purchased the gun from his contact in June 2017.

Jones testified that, on the day Bittinger died, they were celebrating the fact that he had been hired for a new job, while the kids were staying with Bittinger's sister. After work, Jones went to a cookout. According to Jones, by the time he got back to the apartment, he was too intoxicated to be out in public, so he and Bittinger "just decided to smoke [marijuana] and drink and just chill at the house." Jones said that "[e]verything was great" that evening, that they "were having a good time," and that they did not have an argument or fight of any kind.

Jones claimed that he was not very familiar with guns, but that he decided to "take the Hi-Point apart and try to clean it" because he "was worried that the gun was known for jamming." Providing a description of events contrary to the story he had told the 911 dispatcher and police officers at the crime scene, Jones said, "I had the gun cocked with the slide cocked back with the level switched up. And when I put the clip in the gun, switched the level down, the gun discharged." According to Jones, Bittinger, who was bent over

"rolling a blunt" on the bed at the time, said, "Baby, I'm shot," and collapsed on the floor. Jones said he turned her over onto her back and tried to use a towel to put pressure on the wound while calling 911. Jones testified that he then contacted several people to tell them "I accidentally shot [Bittinger]." When asked why he told the police something different, he said, "I was scared. I was devastated. I knew — I didn't know how to explain it to them." When asked if he intentionally shot Bittinger, Jones responded, "No, I did not."

On cross-examination, Jones admitted that he had lied to the 911 dispatcher. Jones said that he dropped the gun next to Bittinger's body when he went to her aid, that he put down the magazine before he flipped her over, and that he was not trying to stage the scene. When asked why the magazine was lying on top of Bittinger's arm if he had put it down before turning her over, Jones responded, "I really don't recall."

The prosecutor asked Jones about fighting with Bittinger. Jones said that they had been in a physical altercation in which Bittinger's "eye was blackened" and that he could not recall whether

12

he had choked her too. When asked how many times he put his hands on Bittinger, Jones said, "Well, I would say as far as the pictures — physically hitting her in her face, that was one incident. But it has been incidents where I would grab her by my arms to defend myself from being attacked when she lashes out and try to hit me and I was just pinning her down." Following Jones's testimony, defense counsel called two witnesses to testify to Jones's good character.

2.  Jones argues that the trial evidence was insufficient to show that he killed Bittinger with malice aforethought. Relatedly, he argues that the State failed to rebut beyond a reasonable doubt his affirmative defense of accident. We disagree.

Sufficient evidence supports a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Miller v. State*, 312 Ga. 702, 705 (1) (864 SE2d 451) (2021) (quoting *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). "It is the jury's role

13

to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Hart v. State*, 305 Ga. 681, 683 (827 SE2d 642) (2019) (citation and punctuation omitted).

A person commits malice murder if he "unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). Express malice requires "deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof," whereas implied malice exists "where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." OCGA § 16-5-1 (b).

"The affirmative defense of accident arises when a defendant contends that his acts were accidental or a product of misfortune rather than criminal intent or negligence." *Hart*, 305 Ga. at 683. See also OCGA § 16-2-2. When successful, an accident defense "negates the defendant's criminal intent, whatever that intent

14

element is for the crime at issue." *Hart*, 305 Ga. at 683.

Here, sufficient evidence authorized a rational trier of fact to reject Jones's accident defense and find him guilty beyond a reasonable doubt of malice murder. See *Jackson*, 443 U. S. at 319 (III) (B). The evidence showed that Jones physically abused Bittinger, causing visible marks and bruises. The evidence further showed that the abuse increased and escalated over time, supporting an inference that Jones graduated from using bodily physical force against Bittinger to harming her with a firearm. Moreover, the evidence provided a possible motive for the murder — Bittinger's expectation that she would soon receive an inheritance that would allow her to leave the relationship. Such evidence supported a finding that Jones acted with either "deliberate intention" or an "abandoned and malignant heart" when he killed Bittinger, authorizing the jury to find either express or implied malice. OCGA § 16-5-1 (b).

Moreover, the record contained additional evidence from which a rational juror could have rejected Jones's claim that he

accidentally killed Bittinger.  First, the jury could have concluded that Jones was lying about the shooting being an accident because Jones could not explain the placement of the pistol's magazine on Bittinger's arm, which suggested that he had staged the scene to make it look like Bittinger shot herself, and Jones admitted initially lying to officers about who was responsible for her death.  Second, Jones's story about accidentally shooting Bittinger while reassembling the gun failed to account for the live round of ammunition found outside the bedroom.  Finally, the jury could have inferred that the shooting was intentional rather than accidental based on the expert testimony about the Hi-Point pistol's safety features, including a manual safety, a magazine safety, and a six-and-a-quarter pound trigger pull, which decreased the likelihood of an accidental discharge.

"[T]he issue of whether a killing is intentional and malicious is for the jury to determine from all the facts and circumstances." *Howard v. State*, 308 Ga. 574, 576 (842 SE2d 12) (2020) (citation and punctuation omitted).  Here, sufficient evidence supported the jury's

16

verdict. See *Jones v. State*, 304 Ga. 320, 323 (2) (818 SE2d 499) (2018) (holding that sufficient evidence established malice murder where the defendant, who had a history of violence toward his girlfriend, shot his girlfriend, initially denied responsibility for the shooting, and then testified at trial that he shot the victim accidentally).[5]

3.    Jones raises an ineffective-assistance-of-counsel claim, arguing that trial counsel performed deficiently when she called as a character witness Jones's neighbor, Wilton Ray Blount, Sr., which he says opened the door to prejudicial character evidence. To establish ineffective assistance of counsel, a defendant must show that (1) "trial counsel's performance was so deficient that it fell below an objective standard of reasonableness," and (2) "counsel's

---

[5] The record also belies Jones's assertion that the trial court erroneously applied "the *Jackson* sufficiency of evidence standard" when assessing his general grounds for a new trial under OCGA §§ 5-5-20 and 5-5-21. See *Walker v. State*, 292 Ga. 262, 264 (2) (737 SE2d 311) (2013) (holding that a trial court abuses its discretion if "it evaluates the general grounds [for a new trial under OCGA §§ 5-5-20 and 5-5-21] by applying the standard of *Jackson v. Virginia*" rather than "exercis[ing] its discretion and weigh[ing] the evidence"). Here, the trial court neither cited *Jackson* nor relied on the *Jackson* standard for assessing the sufficiency of evidence when ruling on Jones's motion for new trial on the general grounds.

deficient performance prejudiced the defense such that a reasonable probability exists that the trial results would have been different but for counsel's performance." *Bragg v. State*, 295 Ga. 676, 678 (4) (763 SE2d 476) (2014) (citing *Strickland v. Washington*, 466 U. S. 668, 684 (II) (104 SCt 2052, 80 LE2d 674) (1984)). "This Court accepts a trial court's factual findings and credibility determinations on an ineffectiveness claim unless they are clearly erroneous, but we apply legal principles to the facts de novo." *Powell v. State*, 309 Ga. 523, 526-527 (2) (847 SE2d 338) (2020).

At trial, Blount testified that he had been Jones's neighbor for four years and considered him a friend. Blount further testified that he had never seen Jones and Bittinger argue, that he had never seen bruises on Bittinger, and that Jones did not have a reputation in the community for abusing or mistreating women. On cross-examination, the prosecutor asked:

> Are you aware that the defendant was convicted of family violence-battery, as it relates to [another person] and was convicted of domestic violence battery for the same person as well as simple battery and cruelty to children in the third degree for committing acts of family

18

violence-battery in the presence of a child under the age of 18 years old?

Blount answered, "No."[6]  On redirect examination, defense counsel asked Blount, "Based on what the State just said, does that change your opinion of Mr. Jones?"  Blount responded, "Absolutely not."

At the hearing on his motion for new trial, Jones did not call his trial counsel to testify.  When asked if he had "want[ed] to call Mr. Blount as a witness" at trial, Jones testified, "Not really, no.  No sir."  Jones further testified that he believed Blount's testimony "made [Jones] look kind of . . . bad in front of the jury" because it "made [Jones] out to be . . . this violent guy" when Blount was asked whether he knew Jones "ha[d] another incident with someone else and . . . [Blount] answered no, he didn't recall that."  The trial court rejected Jones's ineffective-assistance-of-counsel claim, concluding, in relevant part, that Jones had not shown prejudice because, although Blount testified that he was unaware of Jones's prior convictions, overwhelming evidence established Jones's guilt.

---

[6] The prosecutor did not seek to admit evidence of the convictions.

19

The trial court did not err in concluding that Jones failed to establish prejudice from trial counsel's decision to call Blount as a witness. Blount's cross-examination permitted the jury to hear that Jones had prior domestic-violence convictions. Nevertheless, it is unlikely that a single question from the State, which asked only whether Blount knew that Jones was convicted for abusing someone other than Bittinger without disclosing details of the abuse, made a difference to the defense. This is so not only because, in deciding whether Jones murdered Bittinger, the jury would have found more relevant and persuasive the substantial evidence showing that Jones abused Bittinger, including his own admission that he had done so on one occasion, but also because the evidence of Jones's guilt was strong. See *Valrie v. State*, 308 Ga. 563, 568 (2) (a) (842 SE2d 279) (2020) (no prejudice from counsel's failure to object to evidence where "other evidence" that "would have been more persuasive" in proving the relevant point was admitted). See also *Lynn v. State*, 310 Ga. 608, 618 (4) (c) (iii) (852 SE2d 843) (2020) (no prejudice where there was "strong evidence of guilt"). Indeed, Jones

20

admitted that he shot Bittinger and that he falsely told police officers that Bittinger shot herself. Moreover, the trial evidence supported a strong inference that Jones intentionally shot Bittinger after defeating several safety features built into the Hi-Point pistol and then staged the crime scene to avoid getting caught. Accordingly, Jones failed to establish a reasonable probability that, but for counsel's decision to call Blount as a witness, the trial results would have been different. See *Bragg*, 295 Ga. at 678 (4).[7]

*Judgment affirmed. All the Justices concur.*

---

[7] Because Jones did not establish prejudice, we need not address the deficiency prong of his ineffective-assistance-of-counsel claim. See *Lynn*, 310 Ga. at 613 (4) ("[F]ailure to meet either of the prongs is fatal to an ineffectiveness claim.").

Decided August 9, 2022.

Murder. Fulton Superior Court. Before Judge Adams.

*Brownstone, P.A., George W. Thomas*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Mathew E. Plott, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.