NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 15, 2024

S24A0448. ROSENBAUM v. THE STATE.

ELLINGTON, Justice.

Jennifer Rosenbaum appeals her convictions for felony murder and numerous counts of aggravated assault, aggravated battery, and cruelty to children in connection with the death of her two-year-old foster child, Laila Daniel, and the physical abuse of then four-year-old M. P., Laila's biological sister who was also Rosenbaum's foster child.[1] Rosenbaum contends that her trial counsel provided

---

[1] The crimes occurred in October and November of 2015, and Laila died on November 17, 2015. Rosenbaum and her husband Joseph were originally indicted on September 15, 2016. The Henry County District Attorney's office voluntarily recused itself from the case on January 30, 2017, and the Georgia Attorney General assigned the case to both the Cobb County and DeKalb County district attorney's offices. See *State v. Rosenbaum ("Rosenbaum I")*, 305 Ga. 442, 443 n.2 (826 SE2d 18) (2019). Rosenbaum and Joseph were reindicted on August 3, 2017, by a Henry County grand jury. On November 30, 2017, they were again reindicted on a total of 49 counts. Rosenbaum alone was charged with malice murder, three counts of felony murder, six counts of aggravated assault, one count of aggravated battery, and six counts of cruelty to children

ineffective assistance by failing to request a jury instruction on the

Both Rosenbaum and Joseph were jointly charged with nine counts of aggravated assault, five counts of aggravated battery, fourteen counts of cruelty to children in the first degree, and two counts of cruelty to children in the second degree. Joseph alone was charged with murder in the second degree and cruelty to children in the second degree. On February 27, 2018, the trial court granted Rosenbaum's and Joseph's motion to suppress evidence recovered from electronic devices, the State properly filed a notice of appeal, and this Court affirmed the trial court's order on March 11, 2019. See *Rosenbaum I*, 305 Ga. 442.

After a jury trial that lasted three and a half weeks and ended on August 1, 2019, Rosenbaum was found guilty on all counts with which she was charged except malice murder and two counts of felony murder. (Joseph was found guilty on all counts with which he was charged except two counts of aggravated assault, three counts of aggravated battery, and five counts of cruelty to children in the first degree.)  On that same day, Rosenbaum was sentenced to serve life in prison for felony murder predicated on aggravated battery; thirty-three prison terms of twenty years each, to run concurrently with each other but consecutively to the life sentence, for thirteen counts of aggravated assault, three counts of aggravated battery, and seventeen counts of cruelty to children in the first degree; five prison terms of twenty years each, to run concurrently with each other but consecutively to one of the aforementioned aggravated assault sentences, for two counts of aggravated assault, one count of aggravated battery, and two counts of cruelty to children in the first degree; and two concurrent prison terms of ten years each for cruelty to children in the second degree, for a total sentence of life plus forty years in prison. The remaining counts with which Rosenbaum was charged, aggravated assault, aggravated battery, and cruelty to children in the first degree, were merged into the felony murder conviction. (Joseph was sentenced to serve a total of sixty years in prison. )

Rosenbaum filed a timely motion for new trial, which she amended through new counsel four times. After a hearing on February 28, 2022, and April 5, 2022, the trial court denied the motion for new trial, as amended, on December 13, 2022. Rosenbaum filed a timely notice of appeal,  and the case was docketed in this Court to the April 2024 term and orally argued on April 18, 2024. (Joseph also appealed to this Court at the same time, see Case No. S24A0449, but we transferred his case to the Court of Appeals on December 28, 2023.)

law of justification and by laboring under an unwaivable, actual conflict of interest. For the reasons explained below, we affirm.

The State presented evidence at trial showing that while Laila and M. P. were in the sole care of Rosenbaum on November 17, 2015, Laila sustained fatal blunt force trauma to her torso that lacerated her liver and transected her pancreas, causing internal bleeding. Rosenbaum told detectives and medical staff that she noticed Laila choking on a piece of chicken and she tried unsuccessfully to give emergency care. The evidence showed, however, that neither asphyxiation nor improper resuscitation methods caused Laila's death. There was also extensive evidence that both girls had numerous prior injuries and bruising that were not consistent with Rosenbaum's and her husband Joseph's explanations of accidental trauma.

At 5:41 p.m. on November 17, 2015, Rosenbaum called 911 and reported that Laila was choking on a piece of chicken and stopped breathing. Emergency personnel arrived at 5:53, but Laila was unresponsive, and despite efforts to locate and clear an airway

3

obstruction, she never vomited or ejected food. At the time, Laila was covered in bruises around her diaper, on all extremities, and down her neck and back, and her left arm appeared to be broken. Rosenbaum told a police officer that she had tried the Heimlich maneuver because Laila was choking on a piece of chicken.

A few minutes after Laila arrived at the hospital, resuscitative efforts were stopped, and she was pronounced dead. When Rosenbaum and Joseph were told, they were "kind of quiet" and "didn't really ask a lot of questions" at first. When she and Joseph were asked if they had any questions, Rosenbaum reiterated her explanation that she tried the Heimlich maneuver when Laila was choking on chicken. The medical professionals and the coroner who saw Laila at the hospital noticed substantial bruising that was all over her body, that had occurred at different times, and that was inconsistent with being caused by resuscitative measures. An x-ray revealed an older fracture of the right tibia, as well as a fracture of the left arm that was only one to three weeks old.

At the hospital, Rosenbaum told the coroner, a detective, and a

Department of Children and Family Services ("DFCS") investigator that her husband had gone to work at 4:30 p.m., that she was home getting M. P. ready to leave the house when she found Laila choking on some chicken from dinner, that Laila was "white in color" and shaking and was kicking during the whole incident, and that Rosenbaum attempted the Heimlich maneuver, tried to clear the airway with her finger and a butter knife, and dropped Laila a short distance to the floor and pinned her legs to the floor to keep her from kicking while Rosenbaum tried to perform CPR. During that conversation at the hospital, Rosenbaum "seemed pretty calm" and kept saying that she did not know why she could not cry, but Joseph was "crying" and "distraught."

During a recorded police interview on November 23, 2015, Rosenbaum said she was the girls' primary caretaker, they did not attend daycare, and she and her husband were with Laila throughout the week prior to her death. After Rosenbaum returned home "around" 4:00 p.m. from a final exam at law school on November 17, Joseph left for work, and Rosenbaum prepared and

5

served a meal. As she later prepared to take Laila and M. P. out of the house, she heard movement in the kitchen, noticed Laila with her "head back" in the highchair, and ran over to her. Rosenbaum described Laila as unable to breathe, "look[ing] like she was choking," with her arms "twitching" and her legs kicking. Rosenbaum stood Laila on the ground, got behind her, quickly tucked Laila's arms under Rosenbaum's arms, and "pushed against" her stomach and lower chest area. Rosenbaum demonstrated her attempts to perform the Heimlich maneuver, which lasted "less than thirty seconds or so," but she did not know how many attempts she made because she was "panicking." Rosenbaum said that no food came out and that she did not think Laila was getting air because she was not coughing. So Rosenbaum used her finger to try to clear the airway, massaged Laila's chest with her fist, took Laila to the sink, and leaned her over the counter to "pat" and "thrust" on her back. Then Rosenbaum sat Laila in the sink, held her tongue down with a butter knife, and used a finger again, "trying anything and everything" that came to her mind. Rosenbaum said that some

pieces came out but it "didn't seem like the whole thing was out yet" and she still could not hear a breath. Rosenbaum then laid Laila on the floor and did "the thrust, I guess like CPR . . . probably everywhere" on Laila. When Rosenbaum heard a "gasp," she took Laila back to the sink and used a sprayer hose to "flush out" her mouth. Rosenbaum said that Laila was "back breathing" and Rosenbaum took her to the living room, laid her on her side, called 911, and followed instructions, including directions for performing CPR, until emergency medical personnel arrived and took over.

An expert in child abuse pediatrics testified that Laila had tissue damage on her lower abdomen; a "tremendous amount" of bruising all over her back consistent with being struck by a fist and an object with an "edge to it"; bruises with a "90-degree angle" that were likely caused by a "belt buckle"; and numerous other bruises, none of which were consistent with resuscitative efforts.

The medical examiner testified that Laila sustained twenty-two injuries to her head and neck; chest injuries sustained maybe a few hours before death and not as little as 30 minutes before death;

7

back injuries that were sustained at different times and were inconsistent with back blows and CPR in a resuscitation event; twelve injuries to her arms; and seventeen injuries to her legs. The medical examiner also testified that Laila had numerous internal injuries from blunt-force trauma to her abdomen, including laceration of her liver, separation of her pancreas into two pieces, and other internal injuries to the supporting tissues of the small and large intestines, which together caused internal bleeding.

In the medical examiner's opinion, Laila's abdominal trauma likely occurred about 40 minutes to one hour before the onset of seizures and symptoms such as her arms and legs moving, her head falling back, her eyes rolling back, and choking and difficulty breathing. The medical examiner confirmed that Rosenbaum's description of Laila's choking was not at all consistent with an airway obstruction by a "foreign body," but instead was consistent with a terminal seizure due to shock from blood loss. There was no evidence of any food or vomit in Laila's trachea or anywhere in her airway, and her stomach contained only "very well digested

8

material," not any food particles that could be identified and that would indicate she ate chicken shortly before her death. The medical examiner concluded that Laila's injuries were not consistent with any resuscitative methods and that the manner of death was homicide caused by multiple blunt-force injuries to the torso.

Neither Rosenbaum nor Joseph testified. But the defense presented a number of witnesses, including Dr. Kris Sperry, a forensic pathologist. Dr. Sperry testified that Laila's multiple injuries, including those to her liver and pancreas, were "inadvertently" caused when Rosenbaum believed that Laila was choking on food and made "panicked, frenzied," "chaotic," and "intense efforts" to save her life. Dr. Sperry also testified that the bruises and injuries on Laila's body and on M. P. could have been caused by accidental mishaps and that there was no evidence that they were intentionally caused by a belt or amounted to "inflicted injuries." In Dr. Sperry's opinion, a conclusion that Laila's death was "undetermined" or "more probably than not an accident" would be reasonable.

1. Rosenbaum first contends that her trial counsel provided constitutionally ineffective assistance by failing to request a jury instruction on justification, which Rosenbaum argues was her sole defense to the counts that alleged criminal conduct occurring on the day of Laila's death – specifically, felony murder, five counts of aggravated assault, and five counts of cruelty to children in the first degree – which charged her with unjustifiably harming Laila during what Rosenbaum claimed was her frantic providing of emergency medical assistance. But justification was not Rosenbaum's sole defense. Instead, trial counsel sought and received an accident instruction, and she made that the focus of the defense. It was not constitutionally deficient to take that course instead.

To prevail on a claim of ineffective assistance, a defendant must prove both that the performance of her lawyer was deficient and that she was prejudiced by counsel's deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To satisfy the deficiency prong of the *Strickland* test, the defendant "must show that [her] attorney performed at trial

10

in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (6) (846 SE2d 57) (2020). "This requires a defendant to overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Scott v. State*, 306 Ga. 417, 419-420 (2) (831 SE2d 813) (2019) (citation and punctuation omitted). "Decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Thomas v. State*, 311 Ga. 706, 714 (2) (a) (859 SE2d 14) (2021) (citation and punctuation omitted). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (III) (B). If an appellant fails to show either deficiency or prejudice, this Court need

11

not examine the other prong of the *Strickland* test. See *DeLoach v. State*, 308 Ga. 283, 288 (2) (840 SE2d 396) (2020).

Trial counsel did request, and the trial court gave, the pattern jury instruction on accident. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.41.30 (4th ed. 2007, updated Aug. 2020). During her closing argument, counsel relied on Dr. Sperry's testimony and argued that Laila's death resulted from "the Heimlich maneuver gone bad," that Rosenbaum did not know how to perform the Heimlich or CPR, that she damaged Laila's internal organs by "improper CPR" and "improper Heimlich" with too much force for a child, and that Rosenbaum was trying to save her during a "chaotic, frenzied scene."

Trial counsel, who was retained to represent both Rosenbaum and Joseph, testified at the hearing on their motions for new trial that she and her clients developed accident, not justification, as their theory of defense because of Rosenbaum's repeated statements, supported by Dr. Sperry's testimony, that Laila's death was an accident caused by poor performance of the Heimlich

12

maneuver and CPR during a choking incident. Counsel believed that a justification defense did not "fit" the evidence at trial because her clients did not claim that Rosenbaum intended to commit any act that would be a crime in the absence of justification, but instead claimed that she accidentally caused Laila's death when she "punched too strongly" during resuscitation efforts, and because a justification defense would have insulted the jurors and made them believe more strongly that it was "outrageous and ridiculous" to put up a defense for this crime.

In its order denying Rosenbaum's motion for new trial, the trial court ruled that "justification was not an appropriate charge to give" and alternatively that, even assuming justification was an appropriate charge to give, it was not Rosenbaum's "sole affirmative defense, since the evidence also allows for a charge of accident."

Rosenbaum argues that the only defense warranted by the evidence was the type of justification set forth in OCGA § 16-3-20 (5) ("The defense of justification can be claimed . . . [w]hen the person's

conduct is justified . . . as provided in Code Section 51-1-29[.]").[2]

Even assuming this could have been a viable justification theory, counsel made a strategic decision to focus on an accident defense. There was evidence supporting the jury charge on accident that the trial court gave in this case. "A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." OCGA § 16-2-2. "When successful, an accident defense 'negates the defendant's criminal intent, whatever that intent element is for the crime at issue.'" *Jones v. State*, 314 Ga. 400, 406 (2) (877 SE2d 232) (2022) (citation omitted). An instruction on accident was warranted because there was some evidence showing that, while rendering emergency care to

---

[2] In relevant part, OCGA § 51-1-29 provides as follows:
Any person . . . who in good faith renders emergency care at the scene of an accident or emergency to the victims thereof without making any charge therefor shall not be liable for any civil damages as a result of any act or omission by such person in rendering emergency care or as a result of any act or failure to act to provide or arrange for further medical treatment or care for the injured person.
OCGA § 51-1-29 (a).

14

Laila, Rosenbaum committed acts that injured Laila but that were performed without either criminal intent or criminal negligence. See *Folson v. State*, 278 Ga. 690, 693 (4) (606 SE2d 262) (2004) (If the jury believed the defendant's testimony that he struck his two-year-old stepson "on the back to clear his airway and pressed the child's abdomen in an effort to perform CPR . . . , it could have found that the child's injuries were inflicted by accident, and that no crime was committed."). See also *McClure v. State*, 306 Ga. 856, 861 (1) (834 SE2d 96) (2019) (In the context of a claim of self-defense in a case involving a shooting death, "[b]y asserting the defense of accident, on the other hand, the defendant does not admit intentionally firing the gun at the victim; rather he accepts for the sake of argument only that he caused the victim's fatal gunshot injuries and asks the jury to conclude that he did so accidentally." (punctuation omitted)).

To the extent that Rosenbaum could have raised a defense of justification, that did not prevent her trial counsel from making an objectively reasonable strategic decision to pursue the defense of accident instead. See *Jackson v. State*, 318 Ga. 393, 397-398 (1) (a)

(897 SE2d 785) (2024) ("Trial counsel's decision about which defense to present is a matter of trial strategy[.]" (citation and punctuation omitted)). As discussed above, the evidence supported an instruction on the defense of accident, and "[a]n attorney's decision to pursue a particular defense is generally reasonable if it is supported by evidence in the case." *Hendrix v. State*, 298 Ga. 60, 63 (2) (a) (779 SE2d 322) (2015). Counsel fulfilled her duty to consult with her client on the trial strategy of what particular defense or defenses to pursue. Cf. id. at 63-64 (2) (a) (explaining that "attorneys do have an affirmative duty to consult with their clients on such matters," but that counsel's failure to consult was not prejudicial to the defense in that case). It was not objectively unreasonable for counsel to believe that an accident defense (requiring a simple lack of criminal intent or criminal negligence) fit the evidence at trial. See *Folson*, 278 Ga. at 693 (4). And the defense of justification was not obviously stronger than the defense of accident. See *Wilson v. State*, 313 Ga. 319, 324-325 (2) (b) (869 SE2d 384) (2022) ("Because some evidence supported the defense theory, and there was no other obviously stronger

16

defense theory available, Appellant has not shown trial counsel's decision to be patently unreasonable."). See also *LeCroy v. United States*, 739 F.3d 1297, 1313 (II) (11th Cir. 2014) ("Crucially, *Strickland* permits attorneys to choose between viable avenues of defense, and attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another, or for selecting a reasonable course without considering some other, equally reasonable course. If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And, our inquiry is limited to whether that strategy, that is, course A, might have been a reasonable one.") (citation and punctuation omitted)); *Jackson*, 318 Ga. at 398 (1) (a) ("[T]he fact that the chosen strategy failed while another reasonable strategy remained unemployed does not render trial counsel deficient." (citation and punctuation omitted)).

Accordingly, counsel's choice to rely solely on the defense of

17

accident, and not to request a jury charge on justification, was not so patently unreasonable that no competent attorney would have made that choice. See *Jackson*, 318 Ga. at 398 (1) (a) ("Unless the choice of strategy [about which defense to present] is objectively unreasonable, such that no competent trial counsel would have pursued such a course, we will not second-guess counsel's decisions in this regard." (citation and punctuation omitted)). Rosenbaum has not shown that her trial counsel's failure to request a jury charge on justification amounted to deficient performance, and this claim of ineffective assistance therefore fails. See *Thomas*, 311 Ga. at 714 (2) (a) (holding that the appellant did not show that his trial counsel's performance was deficient where counsel's decision not to request a jury instruction on impeachment was "consistent with an objectively reasonable defense strategy").

2. Rosenbaum also contends that trial counsel's joint representation of both her and Joseph gave rise to an unwaivable, actual conflict of interest that made it impossible under the Sixth Amendment and applicable ethics rules for counsel to represent both

18

co-defendants at trial, and that counsel was constitutionally ineffective due to the alleged unwaivable conflict of interest. However, the trial court did not abuse its discretion in denying Rosenbaum's motion for new trial on this ground. Any potential conflict of interest was waivable, and the evidence shows that Rosenbaum did waive her right to conflict-free counsel and that her waiver met the applicable constitutional requirements. For these reasons, we need not address whether counsel developed an actual conflict of interest at trial.

The right to counsel in criminal prosecutions, under "the Sixth Amendment to the United States Constitution and Article I, Section I, Paragraph XIV of the Georgia Constitution of 1983, is the right of a defendant who does not require appointed counsel to choose who will represent him." *Registe v. State*, 287 Ga. 542, 544 (2) (697 SE2d 804) (2010). This right to select counsel of one's choice is the "root meaning" of the Sixth Amendment guarantee. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-148 (II) (126 SCt 2557, 165 LE2d 409) (2006). Indeed, "erroneous deprivation of the right to counsel of

19

choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error." Id. at 150 (III) (citation and punctuation omitted). This right "is not unqualified, however." *Registe*, 287 Ga. at 544 (2). For example, with respect to "multiple representation" of co-defendants, "[d]efense counsel ha[s] an ethical obligation to avoid conflicting representations[.]" *Cuyler v. Sullivan,* 446 U.S. 335, 346 (IV) (A) (100 SCt 1708, 64 LE2d 333) (1980).

"Single representation of multiple defendants raises no per se presumption of conflict of interest or prejudice." *Hamilton v. State*, 255 Ga. 468, 470 (2) (339 SE2d 707) (1986). "[I]ndeed, in some cases, certain advantages might accrue from joint representation. . . . Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Holloway v. Arkansas*, 435 U.S. 475, 482-483 (II) (98 SCt 1173, 55 LE2d 426) (1978) (citation and punctuation omitted). Rather than presuming that joint representation violates the Sixth Amendment, trial courts "must recognize a presumption

in favor of [a criminal defendant's] counsel of choice." *Wheat v. United States*, 486 U.S. 153, 164 (II) (108 SCt 1692, 100 LE2d 140) (1988). It is true that this "presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." Id. However, where, as here, "a co-defendant fails to object to multiple representation until after trial, a conflict of interest will not be presumed." *Griggs v. State*, 262 Ga. 766, 768 (4) (b) (425 SE2d 644) (1993).

Trial counsel represented both Rosenbaum and Joseph from the beginning. At the hearing on their motions for new trial, counsel testified that "in order that they both be represented [in] the best way possible, it seemed that they had to be joined," that separate attorneys "might pressure one or the other to testify against one or the other," and that the "will to get a plea and move on" might supplant the "will of the client." Counsel explained that both clients wanted to present a "unified front" and were "adamant about not testifying against each other" and that Rosenbaum herself initially came up with the idea of joint representation. Rosenbaum – a third-

year law student whom counsel considered to be "very, very intelligent" – was "very involved" and would research and "constantly" discuss all of the issues with counsel as part of a collaborative process. Joseph also was involved in preparation of the defense. Counsel frequently discussed potential conflicts of interest with her clients together and with each separately. Counsel would often pause and consider whether there was a potential conflict such as antagonistic defenses. And she concluded that their defenses were not antagonistic.

In June 2017, the State filed a motion to disqualify trial counsel from joint representation. At the hearing on that motion, counsel presented written, signed waivers of any conflict from both clients and stated in her place that each client had consulted with independent counsel and were ready to be questioned by the trial court if the court so desired. In her written waiver, Rosenbaum swore that she was "aware that a conflict of interest may possibly arise" from the joint representation; that she "realize[d] the potential hazards to [her] defense by continuing with such counsel

under the onus of a possible conflict"; that she was "aware of [her] right to obtain other counsel"; and that, while she did "not concede the current existence of a conflict," she "waive[d] any conflict that may arise and [her] right to hire or have appointed conflict-free counsel."[3] The potentially different levels of culpability, as reflected in the indictment, were discussed at the hearing. Trial counsel stated that extension of a plea offer to only one co-defendant could create a potential division of loyalties, but the prosecution did not extend any such offer prior to trial, and both Rosenbaum and Joseph "did not wish to pursue any type of plea offer" and advised counsel not to seek a plea offer. About that issue, because Rosenbaum was a "law student" and Joseph was "a correctional officer," counsel stated that "[t]hey cannot," and "do not wish to[,] take a plea."[4] The trial

---

[3] Joseph's written waiver was substantively identical.

[4] Rosenbaum's position on plea negotiations never changed, and Joseph's position briefly changed only when the jury was actively deliberating on August 1, 2019. Trial counsel and the co-defendants were nervous about the length of deliberations, counsel checked whether either client wanted to discuss a last-minute plea, and Rosenbaum refused, but Joseph wanted to inquire about misdemeanor treatment. Prosecutors made a felony offer that would require Joseph's testimony against Rosenbaum, he would not accept, and the jury returned its verdict that same day.

court denied the State's motion to disqualify.

Soon after the hearing and order on the motion to disqualify, counsel sent Rosenbaum and Joseph a letter, at the trial court's suggestion, that reviewed the relevant ethics rule and its requirements regarding waivers of conflicts of interest. At the hearing on the motions for new trial, Rosenbaum's expert on the ethical and practice requirements of the Rules of Professional Conduct testified that in signed responses to the letters, each client acknowledged that he or she actually sought guidance from independent counsel about any potential conflicts, that each of them wished to waive the conflicts and pursue a joint defense despite the risks, that both parties were innocent of the charges and wished to present a united front, and that neither of them had any information that could be potentially useful or incriminating against the other. Counsel testified that she did not draft her clients' responses to her letter. The trial judge directed trial counsel to let him know as soon as any conflict developed, and as the trial drew near, counsel updated the court on whether there was any potential for

24

antagonistic defenses. Counsel testified that no conflict developed between the June 2017 denial of the motion to disqualify and the 2019 trial, and neither Rosenbaum nor Joseph ever indicated any concern about a conflict even though counsel consulted them frequently and separately about the issue throughout the case.

In its order denying Rosenbaum's motion for new trial, the trial court found that, "prior to trial, [Rosenbaum] and Joseph each executed a waiver of the conflict of interest as to joint representation, which comported with the standards of Rule 1.7 of the Georgia Rules of Professional Conduct" found in Bar Rule 4-102 (d). The trial court also found that neither co-defendant objected to trial counsel's joint representation until after the trial concluded and that Rosenbaum failed to demonstrate that an actual conflict of interest adversely affected her lawyer's performance.

(a) Rosenbaum argues that her trial counsel's conflict of interest was unwaivable under Rule 1.7 (c) of the Georgia Rules of Professional Conduct. A potential conflict is not waivable under Rule 1.7 (c) (1)-(3) if the representation "is prohibited by law or these

25

rules," "includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding," or "involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients." See *Registe*, 287 Ga. at 547 (3) (b). We have already established that joint representation of criminal co-defendants is not prohibited in all cases. See *Wheat*, 486 U.S. at 161 (II); *Hamilton*, 255 Ga. at 470 (2). And neither co-defendant in this case has asserted a claim against the other. The only question is whether the circumstances made it reasonably unlikely that Rosenbaum's trial counsel would be able to provide adequate representation. The evidence showed that, prior to trial, both counsel and her clients consistently desired and planned a "unified front" that included a determination that neither co-defendant would or even could give testimony against the other; their anticipated defenses based on the co-defendants' representations to counsel were not antagonistic; and there were no plea offers, and both co-defendants rejected plea

negotiations. While one of the co-defendants could possibly have changed his or her mind or story before or during trial, neither one did, and it cannot be said that adequate representation by a single attorney was reasonably unlikely. Accordingly, any potential conflict of interest on the part of trial counsel was not unwaivable.

(b) Having determined that any conflict of interest was waivable, we turn to Rosenbaum's arguments that she did not waive the conflict here. Rosenbaum first argues that, assuming arguendo that her trial counsel's conflict of interest was waivable, the trial court was required to hold an on-the-record colloquy to establish that Rosenbaum's waiver was knowing, voluntary, and intelligent. However, Rosenbaum has brought to our attention nothing in Sixth Amendment precedent or in state law that required the trial court to question Rosenbaum personally on the record about her waiver. Under the Sixth Amendment, "a waiver can be valid if obtained during a state trial court proceeding even if the state court does not conduct an on-the-record inquiry, provided that the waiver is knowing, voluntary, and intelligent." *Henderson v. Smith*, 903 F2d

27

534, 537 (II) (8th Cir. 1990). Cf. Fed. R. Crim. P. 44 (c) (2) ("The [federal] court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation."); *Woods v. State*, 275 Ga. 844, 851 (573 SE2d 394) (2002) (Fletcher, C. J., dissenting) (recognizing "that a trial court is not constitutionally required to conduct a hearing on the validity of a waiver whenever defendants are jointly represented," but dissenting to the majority's analysis of the effect of the conflict of interest on counsel's performance at trial).

(c) Rosenbaum also argues that her waiver of any conflict of interest was not knowing, voluntary, and intelligent. "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." *United States v. Rodriguez*, 982 F2d 474, 477 (11th Cir. 1993) (citation and punctuation omitted). A defendant's waiver of her attorney's conflict of interest

"must be established by clear, unequivocal, and unambiguous language," and "[t]he record should show, in some way, that the defendant was aware of the conflict of interest; realized the conflict could affect the defense; and knew of the right to obtain other counsel." Id. (citation and punctuation omitted). See also *Fleming v. State*, 246 Ga. 90, 91 (1) (270 SE2d 185) (1980) (relying on federal authority that "the trial court must be satisfied that the defendant is aware of the possibility of conflicts and the dangerous consequences which may result."). For many reasons,[5] trial courts

---

[5] The considerations expressed in *Wheat* include the potential "whip-sawing" of trial courts and the necessity of addressing waiver only in the pre-trial context:

> [T]rial courts confronted with multiple representations face the prospect of being "whip-sawed" by assertions of error no matter which way they rule. If a district court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance. On the other hand, a district court's refusal to accede to the multiple representation may result in a challenge such as petitioner's in this case.

*Wheat*, 486 U. S. at 161 (II) (citation omitted).

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are

"must be allowed substantial latitude in refusing waivers of conflicts of interest" or allowing joint representation with appropriate waivers. *Wheat*, 486 U. S. at 163 (II); see also id. at 164 (II) (holding that the district court's decision was "within its discretion" and recognizing that "[o]ther district courts might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was 'right' and the other 'wrong'"); *Registe*, 287 at 544 (2) ("The trial court's decision on whether an ethical requirement bars a lawyer from representing a defendant is reviewed on appeal for abuse of discretion."). "A determination that defendants have waived the right to conflict-free counsel disposes of the need to evaluate the actual or potential ineffectiveness of counsel caused by the alleged conflicts of interest." *Rodriguez*, 982 F2d at 477.

The evidence before the trial court on the State's motion to disqualify counsel showed that Rosenbaum, who had received more

notoriously hard to predict, even for those thoroughly familiar with criminal trials.
*Wheat*, 486 U. S. at 162-163 (II).

30

than two years of legal training, was highly motivated not to seek a plea offer and could understand the legal issues in the case, including the advantages and potential disadvantages of a common defense. Along with Joseph – who also was involved in preparation of the defense – Rosenbaum executed a written waiver in which she swore that she was aware of a possible conflict of interest as a result of the joint representation, realized its potential harmful consequences for her defense, and was aware of her right to obtain other counsel; and in which she waived any conflict that may arise and her right to conflict-free counsel. Trial counsel explained that each co-defendant had consulted with independent counsel.[6] Moreover, the relevant surrounding circumstances include not only

---

[6] In this regard, Rosenbaum argues that when she sought the advice of independent counsel, her trial counsel threatened to withdraw from the representation, thereby deterring her from seeking such advice. The evidence of counsel's threat to withdraw, however, did not relate to the co-defendants' consultation with independent counsel about potential conflicts of interest. To the contrary, the threat related to Rosenbaum's much later pre-trial consultation with another attorney about the transcripts and materials needed to preserve for a potential appeal the issue of the trial court's denial of an ex parte motion for supplemental funds. Accordingly, trial counsel's threat to withdraw did not deter Rosenbaum from fully consulting with independent counsel about potential conflicts of interest.

Rosenbaum's background and experience, but also counsel's continuing efforts, as directed by the trial court, to monitor the case for the development of any conflicts and to continue consultations with her clients regarding that issue. The evidence showed that Rosenbaum's waiver of her right to conflict-free counsel was knowing, voluntary, and intelligent. Considering all of the circumstances, we conclude that the trial court did not abuse its discretion in denying Rosenbaum's motion for new trial on this ground. And because Rosenbaum waived her right to conflict-free counsel, we need not reach Rosenbaum's contention that trial counsel developed an actual conflict of interest that adversely affected her representation of Rosenbaum. See *Rodriguez*, 982 F2d at 477.

*Judgment affirmed. All the Justices concur, except Colvin, J., disqualified.*